IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


UNITED STATES OF AMERICA                                   PLAINTIFF/RESPONDENT


        V.                        Case No. 5:21-CR-50029-TLB-MEF-4


JEREMY THORNTON                                             DEFENDANT/MOVANT



**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

        Currently before the Court is a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or

Correct Sentence by a Person in Federal Custody filed on April 27, 2023[1], by the *pro se*

Defendant/Movant, Jeremy Thornton ("Thornton").  (ECF No. 192).  The United States filed its

response on July 10, 2023.  (ECF No. 199).  Thornton did not file a reply.  The matter is ready for

report and recommendation.

## I.        BACKGROUND

        The case involves a conspiracy to distribute methamphetamine in Northwest Arkansas.

Thornton and three co-conspirators were indicted on June 9, 2021.  (ECF No. 1).  Count One of

the Indictment alleged that Thornton and his co-conspirators "did knowingly and intentionally

combine, conspire, confederate and agree with each other, and with others known and unknown to

the Grand Jury to distribute a mixture or substance that contained a detectible amount of

methamphetamine."  *Id*. at 1.  Thornton was arrested in Oklahoma on August 12, 2021 (ECF No.

---

[1] The motion was received and docketed on May 8, 2023, but Thornton declared under penalty of
perjury that he placed the motion in the prison mailing system on April 27, 2023, so by virtue of
the "prison mailbox rule" it is considered filed on that date.  Rule 3(d) of the Rules Governing
Section 2255 Proceedings.

28), and he appeared for arraignment in this District on August 16, 2021, at which time he entered a not guilty plea to the Indictment.  (ECF No. 38).  Attorney John Baureis ("Baureis"), a CJA Panel attorney, was appointed to represent Thornton.  (*Id.*; ECF No. 40).  A detention hearing was held on August 18, 2021, and Thornton was released on a personal recognizance bond with conditions of release.  (ECF Nos. 48, 61, 62).  A jury trial was initially set on October 4, 2023, but then twice continued, being reset for jury trial on February 7, 2022.  (ECF Nos. 42, 78, 90).

On February 7, 2022, Thornton appeared with counsel before the Honorable Christy D. Comstock, U. S. Magistrate Judge, for a change of plea hearing.  (ECF No. 105).  Pursuant to a written Plea Agreement, Thornton entered a plea of guilty to Count One of the Indictment, charging him with conspiracy to distribute a mixture or substance that contained methamphetamine.  (ECF No. 106, ¶ 1).  Thornton expressed satisfaction with the amount of time his counsel had spent with him discussing the case; he confirmed that counsel had explained the charge against him and what the Government needed to prove to convict on that charge; that counsel had answered all his questions; and, that he was fully satisfied with counsel's representation.  (ECF No. 197, pp. 6, 8-9).  The Court explained his Constitutional rights, and Thornton stated his understanding.  (*Id.*, p. 7).  The Court advised Thornton of the maximum possible penalties upon conviction, including a maximum term of imprisonment of 20 years. Thornton responded that he was aware of the maximum penalties.  (*Id.*, p. 9).  Thornton confirmed that nobody was forcing him to plead guilty, and that he made a voluntary choice of his own free will to plead guilty because he was in fact guilty.  (*Id.*, p. 10).

Thornton informed the Court that he had read the Plea Agreement and discussed it with his counsel before signing it.  (ECF No. 197, pp. 10-11).  Baureis had answered all his questions about the Plea Agreement, and Thornton admitted that he was not promised anything not contained in

the Plea Agreement.  (*Id*., p. 11).  He acknowledged that although he and his counsel had conversations about the anticipated sentence to be imposed, he understood that the sentencing judge had the final decision on the sentence to be imposed.  (*Id*.).  He stated his understanding that he could not withdraw his guilty plea if he received a sentence that he believed to be unfair or too harsh.  (*Id*., p. 12).  He further confirmed that nobody had promised him that he would receive any particular sentence.  (*Id*.).  He was also advised that the Court would consider relevant conduct at sentencing, and he stated his understanding.  (*Id*., p. 13).

AUSA Sydney Butler then recited the facts supporting Thornton's guilty plea, and Thornton agreed with and admitted that such facts were true and could be proved by the Government if he went to trial.  (ECF No. 197, pp. 14-16).  Baureis also informed the Court that he believed the Government could prove those facts if the case were to go to trial.  (*Id*., pp. 16-17).  At that point, Thornton pleaded guilty to Count One of the Indictment charging him with conspiracy to distribute methamphetamine.  (*Id*., p. 17).  The Court determined that Thornton was fully competent and capable of entering an informed guilty plea; that he was aware of the charge against him, the potential penalties, and the consequences of pleading guilty; that his guilty plea was knowing and voluntary; that his guilty plea was supported by an independent basis in fact which contained all of the elements of the offense; and, upon making those findings, Judge Comstock advised Thornton that she would enter a report and recommendation to the District Judge that Thornton's guilty plea be accepted.  (*Id*., pp. 17-18).  Sentencing was deferred pending a presentence investigation.  (*Id*., p. 18).

The Initial Presentence Investigation Report ("PSR") was filed on April 5, 2022.  (ECF No. 146).  Thornton was reported to be accountable for at least 3.59 kilograms of methamphetamine (actual); his total offense level was calculated as 37; his criminal history score

3

of zero placed him in Criminal History Category I; and the advisory guideline range was 210-240 months.[2]  (*Id.* at ¶¶ 114, 119-129, 137, 170).

The Government made two objections to the PSR on April 19, 2022, requesting factual revisions for "additional context" regarding paragraphs 85, 91, and 98 of the PSR.  (ECF No. 155). On the same date, Thornton filed numerous objections to the PSR, including: objections to other co-defendants' conduct, which he stated did not inculpate him and were irrelevant to his PSR; a denial that he distributed "significant amounts of methamphetamine"; to various other factual matters reported in the PSR; to the deliveries of methamphetamine on April 30 and May 11, 2021, being attributed to him because "said deliveries were made under duress"; to maintaining a premise for the purpose of distributing a controlled substance; and, to not receiving a downward adjustment for his role in the offense as a minimal or minor participant.  (ECF No. 156).

The Probation Officer resolved both Government's objections by amending paragraphs 85, 87, 88, 91, and 98 to reflect the requested information.  (ECF No. 159-1, p. 1).  The Probation Officer resolved one of Thornton's objections, i.e., that he did not live with co-defendant Jessica Harlow at her residence in Gentry, Arkansas, by concluding that the reported information was accurate, but adding a footnote setting forth Thornton's contention.  (*Id.*, p. 7).  Thornton's other objections remained unresolved for sentencing.  (*Id.*, pp. 1-7).

Baureis filed a Sentencing Memorandum on Thornton's behalf on May 27, 2022.  (ECF No. 168).  In it, he argued that Thornton should only be held accountable for one kilogram of a mixture of methamphetamine, corresponding to a base offense level of 30.  (*Id.*, pp. 2-4).  He again asserted his contention that he should receive a four-level decrease in offense level as a minimal

---

[2] The United States Sentencing Commission Guidelines Manual for 2018 was used in preparing the PSR.  (ECF No. 146, ¶ 118).

participant, and that an additional two-level decrease was proper under U.S.S.G. § 2D1.1(b)(17). (*Id*., pp. 4-8).  He disagreed that a two-level enhancement was appropriate for maintaining his premises for the distribution of controlled substances.  (*Id*., pp. 8-10).  Lastly, he argued that a downward variance was warranted pursuant to the 18 U.S.C. § 3553 factors.  (*Id*., pp. 10-16).  The Government responded, stating that Thornton did not commit the offense under duress, and that his contention demonstrated that he had not fully accepted responsibility for his conduct.  (ECF No. 169).

Thornton appeared for sentencing on June 10, 2022.  (ECF Nos. 172, 198).  Before the sentencing began, the Court called counsel into chambers and advised that Thornton could lose his reduction for acceptance of responsibility if he pursued his objections to relevant conduct.  (ECF No. 199-1, ¶ 6).  Baureis informed Thornton of the potential consequences of pursuing the objections to relevant conduct, telling him that the best course of action would be to withdraw the objections to relevant conduct and to argue for a downward variance.  Thornton agreed to this approach.  (*Id*., ¶¶ 6, 7).

During the sentencing hearing, Thornton again expressed satisfaction with his counsel.  (ECF No. 198, p. 2).  As the Court turned to Thornton's objections to the PSR, Baureis announced that Thornton was withdrawing Objections No. 3, 4, 5, 6, 7, 8, 9, 11, 13, 14 and 15.  (*Id*., pp. 8-12, 14-15, 18-19).  Objection 12 was resolved by revising the PSR to note that Thornton's co-defendant, Jessica Harcrow, had admitted at her sentencing that the RV residence was jointly owned by her and Thornton.  (*Id*., pp. 12-14).  Thornton persisted, however, in his objection to the PSR assessing a two-level enhancement for maintaining a premise for the purpose of distributing a controlled substance.  (*Id*., pp. 23-26).  The Court overruled that objection, finding that the Government had established by a preponderance of the evidence that the two-level enhancement

pursuant to U.S.S.G. § 2D1.1(b)(12) was applicable, noting that the circumstances presented "a very classic example of where the premises enhancement should apply." (*Id.*, pp. 26-28). Thornton also argued in support of his objection to not receiving a four-level reduction as a minimal participant in the criminal activity. (ECF No. 172, pp. 34-40). The Court found that Thornton had failed to establish entitlement to a mitigating role adjustment, finding that his involvement was not substantially less culpable than the average participant in the criminal activity. (*Id.*, pp. 42-47). Having resolved all objections, the Court gave approval to the final PSR and to the plea agreement. (*Id.*, pp. 48-49).

After hearing argument from counsel and Thornton's allocution, the Court agreed with Baureis that the advisory Guidelines range of 210-240 months imprisonment was more than sufficient and necessary, and the Court granted a substantial downward variance and sentenced Thornton to a term of 135 months imprisonment, three years supervised release, a $1,900 fine, and a $100 special assessment. (ECF No. 172; ECF No. 198, pp. 86-90). Judgment was entered on June 28, 2022. (ECF No. 174). Thornton did not pursue a direct appeal.

On May 8, 2023, Thornton timely filed his § 2255 motion now before the Court. (ECF No. 192). Thornton asserts three grounds for relief, which the Court summarizes as follows: (1) his guilty plea was involuntary because defense counsel induced him to plead guilty based upon the misrepresentation that he would serve only 48-72 months imprisonment; (2) his counsel was ineffective at sentencing for failing to object to the use of "relevant conduct"; and (3) his counsel was ineffective for failing to adequately consult with him concerning an appeal and in failing to file notice of appeal. (ECF No. 192, pp. 4-8, 15-21). The Government filed its response to Thornton's § 2255 motion on July 10, 2023. (ECF No. 199).

Subsequently, on November 17, 2023, Thornton filed a Motion for Reduction or

Modification of Sentence pursuant to 18 U.S.C. § 3582(c)(2), arguing that Amendment 821 to the United States Sentencing Guidelines provides for a two-level reduction of offense level for certain "zero-point offenders." (ECF No. 200). That motion was denied on January 18, 2024, the Court finding that such relief was precluded because the Court had determined that Thornton possessed a firearm in connection with the offense. (ECF Nos. 205, 205-1).

An evidentiary hearing was held before the undersigned on March 22, 2024. (ECF No. 207). Thornton testified on his own behalf. Defendant's Exhibit 1, a redacted copy of the Attorney Sign-In Sheet for the Washington County jail, was introduced in evidence. The Government called one witness: John Baureis. Government Exhibits 1 – 5 were received in evidence; the first four being e-mails from Thornton to Baureis on June 14, 2022, and the fifth being an e-mail from Thornton to Baureis on June 15, 2022. (ECF No. 207-1).

## II.     DISCUSSION

"A prisoner in custody under sentence . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). A thorough review of Thornton's § 2255 motion and the files

7

and records of this case, along with the testimony and exhibits presented at the evidentiary hearing, conclusively shows that Thornton is not entitled to habeas relief, and the denial and dismissal of his § 2255 motion with prejudice is recommended.

## A.      Effect of a Guilty Plea

It is well established that a defendant who enters a guilty plea waives all non-jurisdictional defenses. *Tollett v. Henderson*, 411 U.S. 258, 266 (1973) (guilty pleas in the *Brady*[3] trilogy were found to foreclose direct inquiry into the merits of claimed antecedent constitutional violations); *Smith v. United States*, 876 F.2d 655, 657 (8th Cir. 1989) ("In pleading guilty, a defendant waives all challenges to the prosecution except those related to jurisdiction," including claims regarding search and seizure), *cert. denied*, 493 U.S. 869 (1989).  Thus, under the *Tollett* line of cases, a defendant who voluntarily and intelligently enters a plea of guilty is precluded from later obtaining collateral review of antecedent non-jurisdictional defects.

When a guilty plea is entered, the focus of a subsequent collateral attack must remain limited to the nature of counsel's advice and the voluntariness of the guilty plea. *Bass v. United States*, 739 F.2d 405, 406 (8th Cir. 1984) (citing *Tollett*, 411 U.S. at 266).  As the Court in *Tollett* observed:

> ". . . a guilty plea represents a break in the chain of events which has preceded it in the criminal process.  When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, *he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  He may only attack the voluntary and intelligent character of the guilty plea* by showing that the advice he received from counsel was not within the standards set forth in *McMann*.[4]  *Id*. at 267.  (Emphasis added.)

---

[3] *Brady v. United States*, 397 U.S. 742 (1970).
[4] *McMann v. Richardson*, 397 U.S. 759, 771 (1970) (If a prisoner pleads guilty on the advice of counsel, he must demonstrate that the advice was not "within the range of competence demanded of attorneys in criminal cases.")

The rationale and ruling of *Tollett*, while a decision concerning a state prisoner's habeas claims, has been adopted by the Eighth Circuit for application to motions made by federal prisoners under 28 U.S.C. § 2255. *See Bass*, 739 F.2d at 406.

The standard for determining the validity of a guilty plea remains whether it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *Machibroda v. United States*, 368 U.S. 487, 493 (1962); and *Kercheval v. United States*, 274 U.S. 220, 223 (1927)). "While a guilty plea taken in open court is not invulnerable to collateral attack in a post conviction proceeding, the defendant's representations during the plea-taking carry a strong presumption of verity and pose a 'formidable barrier in any subsequent collateral proceedings.'" *Nguyen v. United States*, 114 F.3d 699, 703 (8th Cir. 1997) (quoting *Voytik v. United States*, 778 F.2d 1306, 1308 (8th Cir. 1985)). A defendant has a heavy burden to overcome those admissions and show that his guilty plea was involuntary. *Blackledge v. Allison*, 431 U.S. 63, 72-74 (1977).

### B.    Standards Applicable to Ineffective Assistance of Counsel Claims

To prove a claim of ineffective assistance of counsel, a criminal defendant must demonstrate both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the deficient performance prong of the *Strickland* test, one must show that counsel's representation fell below the "range of competence demanded of attorneys in criminal cases." *Id.* at 688. Review of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. Moreover, "[s]trategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). Courts also "do not use hindsight to question counsel's performance," but instead must analyze it according to counsel's situation at the time of the allegedly incompetent act or omission. *Kenley v. Armontrout*, 937 F.2d 1298, 1303 (8th Cir. 1991). If one fails to establish deficient performance by counsel, the court need proceed no further in its analysis of an ineffective assistance of counsel claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

To establish the prejudice prong of the *Strickland* test, one must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The United States Supreme Court has clarified that the proper prejudice analysis is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).

The *Strickland* test applies to claims, like Thornton's third ground for relief, that counsel was constitutionally ineffective for failing to file a notice of appeal. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). A lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. *Id*. (internal citations omitted). This is so "because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice"; failure to do so cannot be considered a strategic decision, as "filing a notice of appeal is a purely ministerial task"; and "the failure to file reflects inattention to the defendant's wishes." *Id*. As for prejudice, "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an

10

appeal." *Id*. at 484.  Thus, an attorney's failure to file a notice of appeal after being instructed to do so by his client constitutes ineffective assistance of counsel entitling a petitioner to § 2255 relief, with no inquiry into prejudice or likely success on appeal being necessary.  *Walking Eagle v. United States*, 742 F.3d 1079, 1082 (8th Cir. 2014) (citing *Barger v. United States*, 204 F.3d 1180, 1182 (8th Cir. 2000) and *Roe v. Flores-Ortega*, 528 U.S. at 478)).

For such a claim to succeed, however, "the defendant must show that he manifestly instructed his counsel to file an appeal.  *Walking Eagle*, 742 F.3d at 1082 (internal quotation and citation omitted).  "A bare assertion by the petitioner that [he] made a request is not by itself sufficient to support a grant of relief, if evidence that the fact-finder finds to be more credible indicates the contrary proposition."  *Id*.

### C.    Analysis

### 1.  Promise of a Specific Sentence Range

For his first ground for habeas relief, Thornton asserts that his guilty plea was involuntary because defense counsel "coerced me to again accept a plea agreement, because the likely result would be a sentence of probation," and then later counsel "presented me with a plea agreement and convinced me to sign it based on his statement that I would actually serve somewhere between 48 and 72 months."  (ECF No. 192, pp. 15-17).  He claims his guilty plea is invalid because "Baureis rendered ineffective assistance by inducing me to plead guilty based on the misrepresentation of what would occur as an outcome."  (*Id*., p. 17).  The record in this case, however, including the written Plea Agreement, the Court's colloquy with Thornton at the change of plea hearing, and his own testimony at the evidentiary hearing, shows that Thornton's guilty plea was voluntary and made with full knowledge of its consequences.

By signing the written Plea Agreement, Thornton admitted that he had fully discussed with

defense counsel the facts of the case and the elements of the crime to which he was pleading guilty. (ECF No. 106, ¶ 4).  He further admitted he had committed each of the elements of the crime to which he was pleading guilty and that there was a factual basis for his guilty plea.  *Id.*  He made additional representations in the Plea Agreement: that he had read the Plea Agreement and had carefully reviewed every part of it with defense counsel; that he fully understood the Plea Agreement; that no promises, agreements, understandings, or conditions had been made or entered into in connection with his decision to plead guilty except those set forth in the Plea Agreement; that he was satisfied with the legal services provided by defense counsel in connection with the Plea Agreement and matters related to it; and, that he entered into the Plea Agreement freely, voluntarily, and without reservation, and his desire to enter a plea of guilty was not the result of threats or coercion directed at him or anyone connected with him.  (*Id.*, ¶ 26).  The Plea Agreement set forth the maximum penalties for the offense he was pleading guilty to, including a maximum term of imprisonment of 20 years.  (*Id.*, ¶ 12).  And of particular significance to his first ground for relief, Thornton explicitly acknowledged that the Plea Agreement did not promise a specific sentence.  (*Id.*, ¶ 15).

Moreover, the colloquy between the Court and Thornton during his change of plea hearing on February 7, 2022, demonstrates that his guilty plea was voluntary, and that he understood the Court was not bound to impose any specific sentence.  Thornton stated he was "absolutely" satisfied with the amount of time that Baureis had spent with him discussing his case; that Baureis had explained the charge filed against him and what the Government needed to prove to convict him on that charge; that Baureis had answered all his questions; and that he was fully satisfied with his counsel.  (ECF No. 197, p. 6).  The Court advised him of the drug conspiracy charge brought against him in the Indictment, and Thornton acknowledged an understanding of the charge against

him.  (*Id*., p. 8).  The Court also advised Thornton of the potential consequences of being convicted of that offense, explaining that it carried a maximum sentence of up to 20 years imprisonment, and Thornton stated he understood.  (*Id*., p. 9).  Thornton confirmed that nobody forced him in any way to plead guilty; nobody threatened him or a loved one with harm if he did not plead guilty; and that his desire to plead guilty was something he was doing voluntarily and completely of his own free will because he was in fact guilty.  (*Id*., p. 10).

Thornton acknowledged that he had reviewed the Plea Agreement with his counsel, that counsel had explained the terms and effects of the agreement to him, and that he had signed the agreement.  (ECF No. 197, pp. 10-11).  He stated no promises had been made to him that were not contained in the Plea Agreement.  (*Id*., p. 11).  The Court questioned Thornton, asking him "[a]lthough you and your counsel undoubtedly have had conversations about the sentence that you anticipate you will receive … do you understand the final sentence imposed here is the decision of Judge Brooks and no one else?"  Thornton responded affirmatively.  (*Id*.).  He expressed understanding that if a sentence was imposed which he believed to be unfair or too harsh, he could not withdraw his guilty plea.  (*Id*., pp. 11-12).  The Court asked Thornton if anyone had promised him that he would be receiving any particular sentence, and Thornton denied that anyone had done so.  (*Id*., p. 12).

As noted in *Zilich v. Reid*, 36 F.3d 317, 320 (3rd Cir. 1994), the very purpose of the plea colloquy is to "uncover hidden promises or representations as to the consequences of a guilty plea." Here, the Court made a thorough inquiry regarding Thornton's understanding of the Plea Agreement, the presentence investigation process, the sentencing factors, and that subject to the statutory minimum and maximum the Court was not bound to impose any specific sentence. Thornton acknowledged, under oath, his understanding of these matters and explicitly stated that

no such promises or representations had been made to him by defense counsel or anyone else.  His sworn statements during the change of plea colloquy "ought not to be lightly cast aside."  *Id.*; *Nguyen*, 114 F.3d at 703.

Thornton's claim also fails because it "founders on abundant circuit precedent holding that inaccurate advice of counsel about the sentencing guidelines or likely punishment does not render involuntary a defendant's decision to plead guilty, so long as the defendant is informed of the maximum possible sentence permitted by statute and the court's ability to sentence within that range." *United States v. Quiroga*, 554 F.3d 1150, 1155 (8th Cir. 2009) (internal citations omitted).  It has long been recognized in the Eighth Circuit that "as long as the district court tells a defendant the statutory range of punishment that he faces and informs him that the sentencing guidelines will be used in determining the sentence, the plea is binding," and "*[t]his is true even when the misunderstanding is caused by defense counsel's erroneous estimation of what the ultimate sentence will be*." *United States v. Vennes*, 103 F. Supp.3d 979, 996 (D.MN. 2015) (emphasis in original) (quoting *United States v. Ramirez-Hernandez*, 449 F.3d 824, 826 (8th Cir. 2006)).  "In other words, a defendant cannot show he was prejudiced from his attorney's advice, no matter how inaccurate it might have been, if the district court essentially cures that inaccurate advice by correctly informing the defendant of his potential sentence." *Id.*

The Plea Agreement clearly informed Thornton of the maximum penalties for the offense he was pleading guilty to, including a maximum term of imprisonment for 20 years.  (ECF No. 106, ¶ 11).  Thornton acknowledged that the Plea Agreement did not promise a specific sentence.  (*Id.*, ¶ 15).  The Court advised Thornton during his change of plea hearing of the potential sentence that could be imposed upon his guilty plea, including a maximum term of imprisonment of 20 years.  (ECF No. 197, p. 9).  And Thornton told the Court under oath that nobody had promised

14

him that the Court would impose any particular sentence.  (*Id.*, p. 12).

During the evidentiary hearing, Baureis testified that he "absolutely" discussed the Sentencing Guidelines with Thornton, and he laid out for Thornton seven sentencing scenarios, from "best case" to "worst case."  The "best case" scenario – which assumed that all issues of drug quantity and any enhancements went Thornton's way at sentencing – resulted in a guidelines range of 46-57 months imprisonment.  Baureis stated that "he was shooting for 10 years, and with participation in RDAP[5], he (Thornton) would get down to six to eight years."  Thornton testified that he understood the statutory sentencing range was zero to 20 years, and that the ultimate decision was up to the Judge.  He knew no specific sentence was promised in the Plea Agreement, and he testified that Baureis did not promise any specific sentence.  He explained that while he was *hoping* for a sentence of four to six years, he knew that a sentence in that range was not guaranteed.

Thornton has presented no evidence to overcome clear proof of a voluntary and informed decision to plead guilty, with knowledge of the potential sentencing consequences, and his first ground for relief fails as a matter of law.

## 2.  Failure to Advise of Relevant Conduct

Thornton next claims that his counsel was ineffective for failing to object to the use of relevant conduct at sentencing.  (ECF No. 192, p. 18).  He states that he "did not understand the inner workings of the Guidelines, and Baureis never explained any of the issues regarding how the relevant conduct would result in a prison sentence of this magnitude."  (*Id.*, pp. 18-19).  This claim is also belied by the record which unequivocally shows that he was informed, and understood, that

---

[5] The Residential Drug Abuse Program, authorized by 18 U.S.C. § 3621, which allows the Bureau of Prisons to reduce the sentences of non-violent offenders who complete the program by up to one year.

relevant conduct could be considered by the Court at sentencing.

First, Thornton pleaded guilty to conspiracy to distribute a mixture or substance that contained methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. (ECF No. 106, ¶ 1; ECF No. 197, p. 17). Thornton was informed of the 20-year statutory maximum at his change of plea hearing, and he stated that he understood. (ECF No. 197, p. 9).

As to Thornton's allegation that he did not understand "relevant conduct" and how it could be used at sentencing, the Court notes that Thornton had no physical or mental disabilities that impaired his ability to understand the terms of the Plea Agreement, including the provision regarding relevant conduct, or his ability to understand Judge Comstock's explanation of the concept of relevant conduct during the change of plea hearing. (ECF No. 106, ¶ 26(b); ECF No. 197, pp. 5-6). There was no language barrier, as Thornton was able to read and write the English language and had graduated from high school. (ECF No. 197, p. 5).

The Plea Agreement contained the following provision regarding relevant conduct:

At the sentencing hearing, the government will be permitted to bring to the Court's attention, and the Court will be permitted to consider, all relevant information with respect to defendant's background, character and conduct, *including the conduct that is the subject of this investigation for which he has not been charged up to the date of this Agreement, and/or which is the basis for any of the counts which will be dismissed* pursuant to this agreement, as provided by § 1B1.3 of the Sentencing Guidelines. (ECF No. 106, ¶ 16) (emphasis added).

This provision of the Plea Agreement is consistent with the background comment to U.S.S.G. § 1B1.3, which provides in pertinent part (emphasis added), "in a drug distribution case, quantities and types of drugs not specified in the count of conviction *are to be included in determining the offense level* if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction."

By signing the Plea Agreement, Thornton represented to the Court that he had read the

agreement (or had it read to him), and he carefully reviewed every part of it with defense counsel; that he fully understood the agreement and was not under the influence of anything that could impede his ability to fully understand the agreement; that no promises, agreements, understandings, or conditions had been made or entered into in connection with the decision to plead guilty except those set forth in the agreement; that he was satisfied with the legal services provided by defense counsel in connection with the agreement and matters related to it; and, that he had entered into the Plea Agreement freely, voluntarily, and without reservation, and his desire to enter a plea of guilty was not the result of threats or coercion directed at him or anyone connected with him.  (ECF No. 106, ¶ 26).  Defense counsel represented that he had carefully reviewed every part of the agreement with Thornton; that he had explained the ramifications of the agreement to Thornton, and he believed Thornton understood the agreement, including what rights were being lost by pleading guilty, and what the United States agreed to do in exchange for the plea of guilty; and that he believed Thornton's decision to enter into the agreement was an informed and voluntary one.  (*Id.*, ¶ 27).

During the change of plea hearing on February 7, 2022, Thornton was asked a series of questions regarding his counsel.  Thornton responded that he was "absolutely" satisfied with the amount of time Baureis worked on the case; that Baureis had explained the nature of the charge against him and answered all his questions; and Thornton stated that he was fully satisfied with Baureis's legal services and representation.  (ECF No. 197, p. 6).

Judge Comstock also explained the concept of relevant conduct during the change of plea hearing.  (ECF No. 197, p. 13).  Thornton was advised that the concept essentially means "that Judge Brooks will consider the totality of the facts and circumstances that surround this conduct, even if it's not related specifically to you and your conduct."  Thornton stated his understanding

of this.  (*Id.*).

Thus, the record plainly shows that Thornton was under no physical or mental impairments which could have adversely affected his ability to understand the Plea Agreement.  The concept of relevant conduct was explicitly addressed in the written Plea Agreement, which Thornton acknowledged reading, discussing with his counsel, and understanding.  And the concept of relevant conduct was explained to Thornton by the Court during the change of plea hearing, with Thornton again expressing his understanding.  All of this occurred prior to the entry of Thornton's guilty plea.

At the evidentiary hearing, Thornton confirmed that Baureis had discussed relevant conduct with him as it related to the drug quantity to be attributed to Thornton, and that consideration of relevant conduct was in the Plea Agreement and was covered by the Court at the change of plea hearing.  For his part, Baureis testified that Thornton did not deny what he had done, and that he knew what he did was wrong, but Thornton wanted to explain why he did it – that he was under "duress" and was "coerced" into doing what he did.  In doing so, however, Baureis knew they "were getting close to the line" of potentially losing the three-level reduction for acceptance of responsibility.

Notably, and ignored by Thornton in his § 2255 Motion, Baureis did initially object to the relevant conduct reported in the PSR.  (ECF No. 156; ECF No. 199-1, ¶ 6).  After Thornton's objections to the Initial PSR were made, the Probation Officer responded, noting that "[t]he Court may wish to consider if the defendant is falsely denying or frivolously contesting relevant conduct in the instant case, which could be viewed as being inconsistent with his acceptance of responsibility." (ECF No. 159-1, pp. 3-5).  The Government, through its Sentencing Memorandum and its Response to the Defendant's Sentencing Memorandum, argued that the objections were

contrary to the factual basis set forth in the Plea Agreement and were inconsistent with acceptance of responsibility. (ECF Nos. 167, 169). Baureis testified that on June 8, 2022, two days before Thornton's sentencing hearing, he met with Thornton for over two hours to prepare for sentencing. During that meeting, Baureis reviewed the PSR Addendum with Thornton, including the Probation Officer's comments regarding the possible loss of acceptance of responsibility, and they also discussed the Government's Sentencing Memoranda which argued that Thornton's objections to relevant conduct were contrary to the factual basis set forth in the Plea Agreement and were inconsistent with acceptance of responsibility. Baureis summarized Thornton's instructions as being "don't lose me the acceptance, but get it as low as possible."

Baureis was informed by the Court in chambers prior to the beginning of the sentencing hearing that pursuing the objections to relevant conduct would likely lead to a loss of the deduction for acceptance of responsibility. (ECF No. 199-1, ¶ 6). Baureis also confirmed this during the evidentiary hearing, and he testified that he informed Thornton of the potential consequences for pursuing the objections to relevant conduct, advising him that the best course of action would be to withdraw those objections and to argue for a downward variance. Thornton deferred to this recommendation, and the objections were withdrawn during sentencing. (*Id.*, ¶ 7). Baureis stressed during his testimony that Thornton made the decision not to pursue the relevant conduct objections. As they discussed and planned, Baureis then argued for a downward variance at sentencing, and the Court ultimately agreed that a downward variance was appropriate, and a below-guidelines sentence was imposed. (*Id.*, ¶ 8).

Contrary to Thornton's assertions that "[t]here can be no sound strategy for counsel's failure to object to the use of relevant conduct" and "[i]t is obvious that Baureis was not employing any strategy when he failed to object to the relevant conduct" (ECF No. 192, p. 18), Baureis did

have a sound strategy for withdrawing the many objections he made, at Thornton's request, to the relevant conduct reported in the PSR.  He knew Thornton had expressly agreed in the Plea Agreement that the Court could consider relevant conduct at sentencing; that Thornton had agreed to the factual basis in support of his guilty plea in the Plea Agreement; and that pursuing the objections to relevant conduct would probably result in the loss of a three-level reduction in offense level for acceptance of responsibility.  His strategy to withdraw the objections to relevant conduct and focus on a request for a downward variance was successful, with Thornton being sentenced to 135 months imprisonment — 75 months below the Guidelines advisory range of 210-240 months imprisonment.  And as noted above, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Rice*, 449 F.3d at 897 (quoting *Strickland*, 466 U.S. at 690).  Thornton has failed to establish any deficient performance by his counsel related to the Court's consideration of relevant conduct at sentencing.

Since Thornton has failed to establish that his counsel's performance was deficient regarding the Court's consideration of relevant conduct at sentencing, there is no need to address the second *Strickland* prong of prejudice.  *Walker*, 324 F.3d at 1040 (if a movant fails to show deficient performance by counsel, the court need proceed no further in its analysis of an "ineffective assistance" claim).  Even so, Thornton cannot establish prejudice.  As the Final PSR makes clear, Thornton was held accountable for the following drug quantities: one kilogram of methamphetamine (mixture) he delivered to co-defendant Josh Harcrow on December 16, 2019 (ECF No. 159, ¶ 74); 112.5 grams of methamphetamine (actual) that Thornton sold to a CS on April 30, 2021 (*Id*., ¶ 83); 998.8 grams of methamphetamine (actual) that Thornton sold to a UC agent on May 11, 2021 (*Id*., ¶ 84); and 2.475 kilograms of methamphetamine (actual) seized by law enforcement during the search of Thornton's residence on May 13, 2021 (*Id*., ¶¶ 85-86).  Since

some of the methamphetamine was a mixture and some was actual, these drug quantities were converted in the PSR, and it was reported that Thornton was accountable for 73,800 grams[6] of total converted drug weight.  (*Id.*, ¶ 114).  Thus, the drug quantities Thornton was held accountable for were from those transactions and/or seizures he was directly involved in, and the Court properly considered such relevant conduct at sentencing.

Thornton is entitled to no habeas relief on this claim.

### 3.   Failure to Consult About an Appeal and to File Notice of Appeal

Thornton's final ground for habeas relief is his claim that, "[o]n the day of sentencing, Baureis did not discuss any possibility of an appeal with me."  (ECF No. 192, p. 20).  He asserts that Baureis "should have recognized that I had a nonfrivolous ground to appeal," and that "[h]ad Baureis bothered to adequately consult with me after sentencing and explain to me how the Court arrived at the sentence I received, Baureis would have known that I desired to appeal."  (*Id.*, pp. 20-21).  He further states that "Baureis failed to respond to me subsequent to sentencing."  (*Id.*, p. 21).

There is no dispute that a notice of appeal was never filed.  The record, however, shows that no appeal was filed because Thornton, after consultation with counsel, voluntarily chose not to appeal.

Regarding Thornton's complaint that Baureis had not explained to him "how the Court arrived at the sentence I received," the record shows that the Court explained in detail how it arrived at the sentence it imposed.  (ECF No. 198, pp. 49-57, 78-87).  The Court reviewed the two-step framework it must use in determining an appropriate sentence.  The Court explained and

---

[6] The Final PSR mistakenly refers to 73,800 "kg" of total converted drug weight, but this is clearly a typographical error, and the reference should be 73,800 grams of total converted drug weight. (ECF No. 159, ¶ 114).

discussed the sentencing factors in 18 U.S.C. § 3553(a), both aggravating and mitigating, that it considered, and during this discussion Thornton repeatedly acknowledged his understanding of the Court's analysis. Baureis had argued, in mitigation, that Thornton had acted under duress when he delivered methamphetamine in the two controlled buys in April and May 2021 (*Id*., pp. 71-76), and the Court explained that duress was not a legal defense under the circumstances, telling Thornton, "[y]ou didn't have to do what you did, and if the friend needed, you know, to pay off a debt, there were other ways to pay off a debt," to which Thornton stated "yes, sir" in understanding (*Id*., p. 86). The Court agreed with Baureis that a sentence of 210 months imprisonment (at the low end of the advisory Guidelines range) was more than sufficient and necessary to effectuate the goals of sentencing, and it varied downward to impose a below-guidelines sentence of 135 months imprisonment. (*Id*., pp. 86-87).

The Court also explained to Thornton his right to appeal the sentence imposed, advising him that any appeal must be filed within 14 days from entry of the Court's Judgment; that the Court will waive the filing fee if he cannot afford it; and that he has the right to be represented by counsel on appeal, and if he cannot afford to retain an attorney for that purpose, then the Court would appoint an attorney to represent him on appeal. (ECF No. 198, pp. 90-91). The Court then informed Thornton:

> At a minimum, Mr. Baureis has an obligation to confer with you and determine whether you would like to appeal and, if so, to assist you in getting that notice of appeal timely filed. (*Id*., p. 91).

Thornton stated his understanding. (*Id*.).

At the evidentiary hearing, Thornton admitted that Baureis had, in fact, talked to him about pursuing an appeal, but he testified that Baureis told him that an appeal would not be successful. Baureis testified that he met with Thornton on June 14, 2022, in person for about one hour to

discuss an appeal.  Defendant's Exhibit 1, the Attorney Sign-In Sheet for the Washington County jail, confirms this meeting, indicating that Baureis arrived at 10:55 a.m.  Baureis did not see any viable issues for appeal, and he stated that when he left that meeting, he understood that "we were not filing an appeal."

Government Exhibits 1 – 5 were received in evidence.  These are printouts of messages sent by Thornton to Baureis from the kiosk at the Washington County jail.  Government Exhibits 1 – 4 are dated June 14, 2022, the date of Baureis's meeting with Thornton concerning an appeal. In Government Exhibit 1, sent at 1:09 p.m. (about one hour after the meeting with Baureis ended), Thornton says[7], "will you please go ahead and appeal it at least we can try to get something off!" Approximately 11 minutes later, Thornton's next message, Government Exhibit 2, asked, "in the appeal can we ask for programs to work and will you please let me know what you find out about the ok [Oklahoma] case."  Less than three minutes after that, in Government Exhibit 3, Thornton also asks, "and I was told to ask about teen challenge for adults is it available for feds?  If so would you please contact them for me."  Then, about 14 minutes later, in Government Exhibit 4, Thornton appears to be getting second thoughts about an appeal, stating in his message to Baureis, "hey if theres a chance of getting more time dont appeal it and if it's a wasre of time but if theres any chance of it helping lets do it please let me know!"  The next day, June 15, 2022, at 3:32 p.m., Thornton tells Baureis, "nevermind on the appeal unless you've thought of some way to win it …" Government Exhibit 5.  Thornton knew he had received a very substantial downward variance on his sentence, and he was concerned about re-sentencing following a successful appeal, stating at the evidentiary hearing, "I didn't want to get more time," and he was "scared to death about that." He candidly admitted at the evidentiary hearing that he did not expect Baureis to file an appeal

---

[7] Spelling and punctuation as in the original exhibits.

after his last message (Government Exhibit 5) on June 15, 2022.  Baureis testified that he first saw these messages from Thornton on June 20, 2022, and that he did not respond to them, relying on Thornton's last message that he did not want to appeal.

To succeed on an ineffective assistance of counsel claim based on the failure to file an appeal, a habeas petitioner must clearly establish that he instructed counsel to file a notice of appeal.  In this case, a notice of appeal was not filed because, as the credible evidence of record demonstrates, Thornton voluntarily decided not to pursue an appeal.  Contrary to the allegations in Thornton's § 2255 Motion, the evidence of record clearly and unequivocally shows that Baureis did confer with Thornton about an appeal, and Baureis left that meeting understanding that Thornton did not want to appeal.  Thornton's subsequent messages to Baureis initially indicated a change of mind and a desire to appeal, but Thornton then changed his mind again about an appeal, and he sent Baureis a final message telling him to "nevermind on the appeal unless you've thought of some way to win it …[,]" and he testified that he did not expect Baureis to file an appeal after his last message.

Thornton has failed to establish that he manifestly instructed his counsel to file an appeal.  *See Walking Eagle*, 742 F.3d at 1082.  There is no showing of deficient performance by Baureis in failing to file a notice of appeal, and this claim should be denied.

### D.    No Certificate of Appealability is Warranted

A Certificate of Appealability may issue under 28 U.S.C. § 2253 only if the applicant has made a substantial showing of the denial of a constitutional right.  A "substantial showing" is one demonstrating that reasonable jurists could debate whether the petition should have been resolved in a different manner or the issues presented deserved further proceedings even though the petitioner did not prevail on the merits in the court considering his case at present.  *Slack v.*

*McDaniel*, 529 U.S. 473 (2000).

For the reasons discussed above, Thornton has not made a substantial showing of the denial of a constitutional right, and any request for a Certificate of Appealability should be denied.

### III.   CONCLUSION

For the reasons and upon the authorities discussed above, Thornton's claims for federal habeas corpus relief lack merit and are undermined by the evidence of record.

Thornton's claim that his guilty plea was involuntary because defense counsel induced him to plead guilty based upon the misrepresentation that he would serve only 48-72 months imprisonment fails because it is contrary to the written Plea Agreement he signed, his representations at the change of plea hearing, and his testimony at the evidentiary hearing.

Thornton's claim of ineffective assistance of counsel for failing to object to the use of "relevant conduct" likewise finds no support in the record and should be denied.  Counsel did object to Thornton's relevant conduct reported in the PSR, knowing that they were "close to the line" of losing the reduction for acceptance of responsibility.  When both the Probation Office and the Government suggested to the Court that such objections were not consistent with acceptance of responsibility, and the Court informed counsel prior to sentencing that pursuing the objections to relevant conduct would likely lead to a loss of the deduction for acceptance of responsibility, counsel informed Thornton of this and he authorized counsel to withdraw the objections to relevant conduct.

Lastly, Thornton's claim that counsel failed to file a notice of appeal after being requested to do so is contradicted by the record.  The record does not show that Thornton manifestly instructed his counsel to file an appeal.  To the contrary, Thornton's final kiosk message to counsel stated "nevermind on the appeal unless you've thought of some way to win it …[,]" and Thornton

testified that he did not expect Baureis to file an appeal after sending that last message.

It is, therefore, RECOMMENDED that Thornton's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 192) be **DISMISSED with PREJUDICE**.

It is further recommended that any request for a Certificate of Appealability be denied.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely written objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of April 2024.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE